IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a
THE JAMES H. ANDERSON LIVING
TRUST, *et al.*,

      Plaintiffs,

      v.                                                             No. 13-CV-00909 WJ/CG

ENERGEN RESOURCES CORPORATION,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFFS' NARROWED MOTION FOR CLASS CERTIFICATION

THIS MATTER comes before the Court upon Plaintiffs' Narrowed Motion for Class Certification Filed Pursuant to District Court Order of July 23, 2018 **(Doc. 235)**. Having reviewed the parties' pleadings and the applicable law, the Court finds that Plaintiffs' motion is well-taken and, therefore, is granted.

### BACKGROUND

Plaintiffs are four trusts owning royalty interests in oil and gas wells that filed a putative class action complaint against Defendant Energen Resources Corporation ("Energen"). Energen is the owner and operator of oil and gas wells in the San Juan Basin, located in Northwestern New Mexico and Southern Colorado. Plaintiffs allege that Energen was systematically underpaying royalties due them from the production of oil and gas from the wells in which they own royalty interests. On appeal, the Tenth Circuit affirmed this Court's rulings granting summary judgment to Defendant on claims asserted by two of the Plaintiffs, but remanded certain claims asserted by the Neely-Robertson Revocable Family Trust which owns royalty interests in New Mexico oil and

gas wells, and the Tatum Living Trust which owns royalty interests in wells located in Colorado. *See Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 847 (10th Cir. 2018) ("*ALT*").

Energen Resources Corporation operated and produced natural gas from approximately 112 wells in the State of Colorado (see Energen's expert report, Doc. 158-1, p. 15) from 2004 until 2015, when it conveyed its interests to Southland Royalty Company. Energen's gathering, treating and processing agreements with "Red Cedar" allowed the use, as fuel, natural gas from Energen's Colorado wells for compression, gas movement, gathering, treating and processing volumes of natural gas produced from the Tatum Trust and Class Members' wells. It is undisputed that Energen does not pay royalty on the volumes of gas produced from the Tatum Trust and putative Class wells, which gas is used for compression, field fuel and plant fuel by Energen and its contracting parties, principally Red Cedar Gathering Company.

As Defendant notes, Plaintiffs now seek to certify a much different class than they originally proposed. Plaintiffs no longer seek to certify a class consisting of *all* Colorado and New Mexico royalty owners and instead restrict the proposed class to the Tatum Trust ("Trust") and only Colorado royalty owners with interests in the 153 leases at issue in this case. Also, Plaintiff seeks class certification based on a single underpayment theory, namely that Energen failed to pay additional royalties on gas used as fuel and that Energen breached its duty of good faith and fair dealing by failing to disclose all deductions related to those royalties. Plaintiffs define the putative class as:

> All persons or entities who own non-cost bearing interests that are subject to the Class oil and gas leases productive of natural gas and other hydrocarbons in the State of Colorado, which were previously owned in whole or in part by Energen and its predecessors by name change, conveyance or acquisition. Southland Royalty Company LLC now owns the leases.

2

Doc. 235 at 4. These oil and gas leases provide for the payment of royalty on natural gas used off the lease premises, and do not contain other language which indicates the lessor is to share the expense or cost of off-lease processes or gathering activity for which the fuel gas is used. Colorado has adopted a version of the marketable condition rule, which in its purest form requires the lessor to market the gas solely at its expense. Under Colorado law, the marketable condition rule applies only when the lease does not provide otherwise. *ALT*, 886 F.3d at 830.

## DISCUSSION[1]

The trial court may certify a class only if, after rigorous analysis, it determines that the proposed class satisfies the prerequisites of Federal Rule of Civil Procedure 23(a). *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006). Rule 23(a) imposes four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Rigorous analysis by the district court before granting class certification is necessary because of the "potential unfairness to the class members bound by the judgment if the framing of the class is overbroad." *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

A class action may be maintained if Rule 23(a) is satisfied and if falls into one of the types of class actions described in Rule 23(b). Plaintiff contends that the putative class satisfies Rule

---

[1] Both parties have submitted expert reports. Doc. 235-1 (Kaplin Rep't) and Doc. 240-1 (Emory Rep't). In reaching its conclusion here, the Court has accorded them the proper weight when considering them along with the other evidence presented by the parties.

23(b)(3)'s requirements of predominance and superiority. *Harrel's LLC v. Chaparral Energy, LLC (Naylor Farms, Inc.)*, 923 F.3d 779, 789 (10th Cir. 2019).

Rule 23(c) requires the Court to "define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B); *see Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 254 (D.N.M. 2016) (citing cases); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir.2012) ("essential" prerequisite to a rule 23(b)(3) class action is that the "class must be currently and readily ascertainable based on objective criteria"). It is Plaintiffs' burden to show that the proposed class complies with Rule 23. *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

**I.    Rule 23(a) Requirements**

    A.    <u>Numerosity</u>

Rule 23(a)(1) requires that the putative class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable. Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 220 (D.N.M. 2016) (citing *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir.2006). Defendant does not challenge this factor and the Court finds that the proposed class is so numerous that joinder of all members is impracticable. This factor is therefore satisfied.

    B.    <u>Commonality</u>

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 374 (2011), cited in *Abraham v. WPX Prod. Prods.,*

*LLC*, 317 F.R.D. 169, 221 (D.N.M. 2016). The focus of Rule 23(a)(2)'s commonality requirement is not so much on whether there exist common *questions*, but rather on "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350*,* cited in *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (emphasis in original).

*Variations in Leases Language*

Energen contends that the Trust's fuel gas claim also is atypical of any claim held by the putative Class Members and that in fact, only two leases are the same as the leases held by the Trust. The leases expressly require royalties to be paid on gas used as fuel, because they "explicitly prohibit Energen from deducting post-production costs." ALT, 886 F.3d at 848-49. Defendant points to language in the Tatum leases:

> 3/16 of the gross proceeds received by Lessee for all gas (including all substances contained in such gas) recovered or separated on the leased premises, produced from the leased premises and sold by Lessee in an arms' length transaction . . . .
>
>     \* \* \*
>
> Lessor shall not bear, directly or indirectly, any production or post-production cost or expenses, including without limitation, cost or expenses for storing, separating, dehydrating, transporting, compressing, treating, gathering, or otherwise rendering marketable or marketing the Products, and no deduction or reduction shall be made for any such costs and expenses in computing any payment, or the basis upon which any payment is, to be made to Lessor . . . .

Doc. 235-3, ¶¶3(b) & (d). Defendant contends that there are only two other leases of the 153 leases containing the same language forbidding Energen from deducting the in-kind post-production cost of fuel gas and that the other leases contain different language as to the allocation of post-production costs.[2] Defendant has attached portions of several leases to their response in order to illustrate some of the variations in lease language:

---

[2] While Defendant claims that only two other leases of the 153 leases contain the *same* language as the Trust forbidding Energen from deducting the in-kind post-production cost of fuel gas; Plaintiffs' expert states that there

5

- Leases that expressly permit the deduction of costs associated with compression and gathering. Ex. E at ¶ 3; Ex. G at §3 & Ex. A at 1;
- Leases that expressly preclude the deduction of these costs. Ex. F at ¶¶ 3, 19.
- Leases that provide for payment on the "amount realized" from the sale of gas in a certain condition. Ex. H;
- Leases that require royalties to be paid on the "greater of" the market value of the natural gas at the well in a condition acceptable for delivery into a transmission pipeline, or the gross proceeds received for the sale of such gas. Ex. J at ¶ 4. These leases require an evaluation of the natural gas' condition to determine the allocation of costs, which is not required by the Trust's leases. Ex. 3 to Mot. at ¶¶ 3(b) and (d).
- Leases that are silent on how post-production costs should be allocated. Exs. C-D.

Doc. 240 at 4-5. Plaintiffs claim that this is a "strawman" argument because the "root" of the Trust's claim for underpayment of royalty on gas used as fuel is *not* the allocation or deduction of post-production costs, but rather the obligation that royalty be paid on gas used as fuel off the leased premises.[3] Plaintiffs' focus is correct, based on both parties' acknowledgment that the fuel gas claim is the single underpayment theory being pursued by Tatum and the putative class, Doc. 235 at 1-2; Doc. 240 at 2, despite Defendant's attempt to steer the claim elsewhere to post-production allocation as the common issue. In its appeal decision, the Tenth Circuit held that the express language of the Tatum lease requires Energen to pay royalty on gas used from the leased premises when use of the gas occurs *off* the premises, reversing this Court's ruling on the fuel gas issue. *ALT,* 886 at 850 (10th Cir. 2018).

---

are only "two leases that are treated differently based on lease language and this is only due to a direct request from the lessor." Doc. 235 at 5. It is not clear whether the differences are based on whether the terms are express rather than implied under Colorado law. These differences are not critical to the Rule 23 commonality analysis here. Plaintiff states that of the 153 leases at issue, there are only five leases which state that the lessor must share the expense of activities for which fuel gas is used, and that these have been eliminated from the list of putative class members. *See* Doc. 244-1.

[3] Defendant presents another "strawman" argument, claiming that Plaintiffs cannot use common evidence of a "uniform payment methodology" to satisfy commonality. Doc. 240 at 17. Defendant is correct in that payment methodology does not establish commonality, particularly where a lease would have to be examined to know when the gas became marketable and therefore subject to royalty. *Roderick,* 725 F.3d at 1219 (payment methodology is "not capable of class-wide resolution"). However, Plaintiffs are not relying on any form of "payment methodology" to argue any of the Rule 23 factors. *Id.* (rejecting uniform payment methodology as basis to establish either commonality or predominance).

Plaintiffs have submitted a chart exhibit that was prepared by their expert. *See* Doc. 235-1. The chart consists of five columns with the last two columns setting forth the free use clause and the gas royalty provision specifying any limitations to the use of free gas. Doc. 235-1; *see ALT* at 848 (noting that a "free use" clause may be limited by other lease provisions). According to the chart, each one of leases specifically states that the lessee is to pay royalty on gas used as fuel off the premises. There are some variations with regard to the listed royalty provisions. *Cmp.* Doc. 235-1, #8690 ("Gross Proceeds and [sic] specifically prohibits charging of production and post-production charges" with #8718 ("gas and the constituents . . . market value at the well . . . Of the product so sold or used . . . amount realized from such sale"). Defendant claims that these variations in the lease language preclude a finding of commonality, but these variations do not defeat commonality that exists.

For illustration, Plaintiffs point to two cases where variations in lease language did not negate the common question related to an implied duty to pay post-production costs under Colorado law. *See Rhea v. Apache Corp.*, No. CIV-14-0433-JH, 2019 WL 1548909, at *8 ( Feb. 15, 2019) and *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 790 (10th Cir. 2019). Energen tries to distinguish *Rhea* and *Naylor Farms* by suggesting that the royalty language in those leases did not vary from lease to lease, but this is not so. The courts in both *Rhea* and *Naylor Farms* did find language variations within the leases but nevertheless concluded that the leases contained clauses creating the implied duty to market as a common question, despite those differences (and thanks to lease charts created by plaintiffs in those cases). *Rhea,* 2019 WL 1548909, at *8 ("Here, like *Naylor Farms*, the court has confirmed that plaintiff's lease chart demonstrates that the leases in this case contain clauses creating the implied duty to market"). The Court agrees with Plaintiffs that *Rhea* and *Naylor Farms* support their position. The leases in those

two cases created a "uniform obligation to bear post-production costs." Here too, the proposed class consists of Colorado royalty owners with leases that impose a single and uniform obligation: to pay royalty on gas used as fuel.

Energen does not offer any cases which hold that variations in lease language in themselves preclude a finding of commonality. Energen cites to *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.* for just that purpose; however, the Tenth Circuit did not remand the case because of variations in lease language but because plaintiffs in that case had failed to carry out their burden to investigate, review the leases and determine if any leases "negated" the implied duty to market. 725 F.3d at 1219 ("On remand, the Trust could, for example, create a chart classifying lease types . . . and . . . the district court could decide that no lease type negates the [implied duty to market]"). In contrast, Plaintiffs here have already done the necessary review and categorization of the leases that are included within the putative Class. Thus, any language differences among lease provisions concerning post-production deductions do not defeat commonality. *See, e.g., Abraham*, 317 F.R.D. at 221 (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988) (commonality is not defeated here where the claims of individual putative class member may differ factually); *In re Intelcom Group Sec. Litig.*, 169 F.R.D. 142, 148 (D.Colo.1996) (factual differences in the claims of the individual putative class members "should not result in a denial of class certification where common questions of law exist").

Plaintiff's lease chart identifies the fuel gas claim that is common to the Colorado royalty owners. *See Naylor Farms,* 923 F.3d at 795 (plaintiff's preparation of chart categorizing leases at issue by royalty language was "precisely what a plaintiff should do to establish commonality . . . .") (citing *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013); *see also Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 249 (D.N.M.

2016) (suggesting that on remand, plaintiffs could "create a chart classifying lease types" to establish predominance).

*Quality of Gas*

Energen contends that the proposed class does not meet the requirement of commonality because of differences in the quality of natural gas produced from Energen's wells and differences in market locations. Some gas could meet downstream specifications prior to processing while some natural gas requires processing to meet those specifications. These questions relate to when gas becomes marketable. *See Roderick,* 725 F.3d at 1219 ("Once gas is in marketable condition, the [implied duty to market] is satisfied—regardless of whether a market exists at that location."). Thus, Energen argues, post-production deductions would be proper for gas that has been determined to be marketable at the well, but would be a breach of the implied duty to market where gas quality affects the point at which the gas becomes marketable. *Id.*

There are two flaws with Defendant's argument. First, and as mentioned above, the underpayment claim being asserted by the proposed Class is not the deduction of post-production costs but rather the obligation that royalty be paid on gas used as fuel off the leased premises. Any differences in allocation of post-production costs relate more to the calculation of damages, which is not before the Court. *See Naylor Farms,* 923 F.3d at 790 (finding that any "variations in lease language" were related to damages and "did not defeat either commonality or predominance"). Second, as Plaintiffs point out, Energen's own expert identifies 87 of the 96 Energen wells in Colorado as "coalbed methane" ("CBM") and only 9 as "conventional." Doc. 244-2. CBM always requires gathering and treating before it can meet pipeline specifications and become marketable. All are subject to a single gathering agreement with Red Cedar and go only to CBM processing plants at Red Cedar and Val Verde. *Id.* at 28. So, even with regard to an allocation of post-

production costs, there is a common issue among the leases because the point of marketability is not as variable or individual as Defendant claims it would be. As the Tenth Circuit noted in its appeal decision:

> The processing of natural gas into a marketable condition is complicated and depends on whether the gas comes from an oil well (casinghead gas), gas well (conventional natural gas), or from coal seams (coalbed methane gas).

*Anderson Living Trust v. Energen Res. Corp.,* 879 F.3d 1088, 1094, n.7 (citing *ConocoPhillips Co. v. Lyons*, 2013- NMSC 009, 299 P.3d 844, 849-50 (N.M. 2012); *see also ALT*, 886 F.3d 826, 847 (10th Cir. 2018) (description of processing for coalbed methane gas). Any differences in gas quality and composition from the wells from the Trust and the proposed Class royalty owners therefore do not defeat commonality.

*Breach of Good Faith and Fair Dealing*

This claim is based on Plaintiffs' allegation that Energen did not disclose the material facts of deductions from the volumes and values of gas produced from the putative Class Members' wells. Defendant contends that this claim lacks commonality for two reasons, but the Court finds neither persuasive enough to deny class certification on the commonality factor. First, Energen argues that the leases in question do not expressly address the allocation of post-production costs such as fuel gas and so whether Energen owed a duty to a royalty owner to identify the volumes of gas used as fuel is a lease-by-lease determination that prevents class certification. This argument veers off from the sole underpayment claim asserted in this case under a theory of breach of good faith and fair dealing: that Energen never reported to the Trust the actual volumes of gas produced and that it would cost more to make the check stub larger in order to incorporate that information. *See* Doc. 235 at 7-8; Doc. 158-2 at 10-13. That issue relates to the Trust's fuel gas claim separate and remains separate and apart from post-production deductions in general.

Second, Defendant contends that the leases have not been examined to determine whether they confer any discretion on Energen with respect to the contents of its monthly royalty payment statements. The degree of Energen's discretion is a matter best left to the merits of the breach claim. The sole question here is whether the claim presents a common question among the putative Class members, and the Court finds that it does.

Plaintiffs have satisfied their burden of showing a common question "that is central to the validity of each one of the claims." *Abraham,* 317 F.R.D. at 221. The Trust and the putative royalty owners have the same factual claims: (a) that they have an oil and gas lease that requires Energen to pay royalty on fuel gas; and (b) that Energen did not pay the Trust or any of the class members for fuel gas taken from their wells, nor did they report to them the fuel gas taken.

C. Typicality/Adequate Representation

Commonality, typicality, and adequacy of representation "tend to merge," because each concerns whether "the named plaintiff's claim and the class claim are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 350 n.5.

Energen contends that the Trust's fuel gas claim also is atypical of any claim held by the putative class members and that it is an inadequate Class representative. Unlike the other leases, the Trust's leases expressly address the allocation of post-production costs such as fuel gas, and therefore do not require an analysis of whether the gas is "marketable" prior to the use of fuel gas, or whether costs can be deducted for some post-production services, but not others. Many of the other leases do not address the allocation of costs and thus are subject to the implied duty to market, and the Trust has no claim for breach of this implied duty. Defendant is correct that the Trust's "implied duty to market" claim was dismissed by the Court. *See* Doc. 232 (Court's Mem. Op. &

Order) at 5-8.[4]  However, Plaintiffs do not define the potential Class *either* as royalty owners with express post-production lease provisions *or* as royalty owners with a common breach of implied duty to market pursuant to Colorado law—and Energen has acknowledged this.  *See* Doc. 240 at 12 (noting that Plaintiffs initially pursued a claim on behalf of *all* owners "based on an overarching implied duty that applied irrespective of individual lease language . . . [but now] the Trust has narrowed its proposed class owners paid only under certain leases . . . .").

The potential Class is now defined as those with royalty owners with leases that required Energen to pay for gas used as fuel off the premises.  Despite the Trust's express terms regarding allocation of post-production costs, the Trust's claim and the class claim are sufficiently interrelated so that the claim is typical of the class, and the interests of the class members will be fairly and adequately protected in their absence.  *See Abraham*, 317 F.R.D. 169 (D.N.M. 2016) (typicality requirement for class certification was satisfied on claims brought by present and former owners of royalty interests in oil and gas leases against oil and gas producers where proposed class members shared same claims, regardless of variations in lease language, and all class members benefited from proposed damages calculation).

## II.     Rule 23(b) Requirements

A class action satisfies Rule 23(b)(3) if:

> the court finds that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for fairly and efficiently adjudicating the controversy

Fed. R. Civ. P. 23 (emphasis added).  The rule's predominance requirement is related to but "more demanding than" Rule 23(a)(2)'s commonality requirement. *Naylor Farms, Inc. v.*

---

[4] The Court granted summary judgment to Defendant on Plaintiff's Fourth Cause of Action which asserted that Energen owes an "implied duty" to market under the terms of the Colorado leases and that the express provisions of the Trust rendered the claim as "unnecessary and superfluous." Doc. 232 at 7.

*Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). To satisfy Rule 23(b)(3), a plaintiff must "show that common questions subject to generalized, classwide proof *predominate* over individual questions." *Id.* The predominance inquiry asks whether the common, "aggregation-enabling" issues in the case are more prevalent or important than the non-common, "aggregation-defeating," individual issues. *Id.*

A Rule 23(b)(3) class must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). Matters pertinent to finding a class "superior" under the rule include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

A. <u>Predominance</u>

Rule 23(b)(3)'s predominance standard is "far more demanding" than the commonality standard. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Predominance requires that common questions must "predominate over any questions affecting only individual members." Rule 23(b)(3); *see also Monreal v. Potter*, 367 F.3d 1224, 1237 (10th Cir. 2004) (applying *Amchem*).

Plaintiffs contend that the Class leases "are very similar in this language and create common questions of both fact and law" based on the common claim involving the non-payment for the Class Members' gas used in order to move the hydrocarbons off the lease premises,

13

including into and through gathering systems as well as in processing and treatment plant operations. Energen points out that the differences in lease provisions regarding post-production use of fuel gas means that damages must be calculated individually, and that different damages defeat predominance. However, the fact that "damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Roderick,* 725 F.3d at 1220 ("Material differences in damages determinations" will only destroy predominance if those "individualized issues will overwhelm . . . questions common to the class"; *Naylor Farms,* 923 F.3d at 798 (finding individualized issues will not overwhelm issues common to the class because there was evidence that plaintiff's expert "can determine damages on a class[ ]wide basis through use of a model," thus obviating the need for individualized evidence). The Court agrees with Plaintiff that the predominate question to be answered uniformly for all is whether Energen owe and fail to pay royalty to the class on fuel gas. The class members' gas (which is almost entirely coalbed methane gas) was subject to only one gathering agreement. Exactly *how much* royalty was owed to each lease owner is a separate question which would be addressed as a damages issue which will be addressed separately. Moreover, the Court finds that the common evidence relating to underpayment of fuel gas used off the premises will outweigh the individualized evidence that may have to be considered in order to ascertain any damages related to how some of the individual leases allocate post-production costs.

   A. <u>Superiority</u>

Energen contends that a class is not a superior method for resolving this case because determining liability and computing alleged damages requires an analysis of royalties paid to each owner, each month, for each well. Defendant insists that resolving the Trust's claims would require forming multiple sub-classes for each type of royalty clause, including sub-groups

accounting for gas quality and composition. These arguments do not withstand scrutiny. The Court has already determined that any differences in gas quality do not seem to be an issue in this case since most gas is CBM that is sent to one third-party processor and so the specter of having to create many sub-groups to resolve the liability and damages issues is somewhat of an overreaction. Nor will the calculation of damages be unmanageable. As Plaintiffs suggest, total class damages can be determined on a class-wide basis using Energen's own paychecks.

Based on a review of some of the check stubs, *see* Doc. 244-6, many of the Class Members' individual claims will be for amounts less than it will cost to prosecute and it would be economically unfeasible to determine the royalty Energen should have paid for fuel gas in many, individual lawsuits. *See, e.g., Anchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (class action achieves "economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable result"). The Court therefore finds that a class action which aggregates the Class Members' claims is superior to forcing the putative Class Members to pursue individual and expensive lawsuits. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 917-918 (10th Cir. 2018) (noting that class members "would have to overcome significant hurdles to adjudicate their individual claims and thus have little "interest[ ] in individually controlling the prosecution or defense of separate actions").

### III.  Rule 23(c)

Rule 23 contains an implicit threshold requirement that the members of a proposed class be "readily identifiable. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria."); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012) (An "essential

prerequisite" to class certification is that the "class must be currently and readily ascertainable based on objective criteria."); Fed. R. Civ. P. 23(c)(1)(B) (requiring Court to "define the class and the class claims, issues, or defenses").

Energen argues that the class cannot be ascertained because the lease language differs regarding specific post-production deductions allowed and that its electronic records do not indicate the individuals from whom the owners received their royalty interests so that it is unable to figure out which owners are being paid with deductions and which ones are being paid without deductions. Defendant's witness, Kimberly Ming, explained in her deposition that Energen paid royalties from "division orders" which do not show the names of the owners with a description of their oil and gas leases.[5] Ms. Ming stated that it was "possible" to generate a report of all royalty owners who have exemptions but that Energen does not have a "ready cross-reference to which lease [those individuals] belong to"). Doc. 240-13 (Ming Dep). at 32.

Plaintiffs aptly refer to this argument as Defendant's "we lost track of which lease goes with which owner" argument. It is based on Defendant's assumption that in order to ascertain the Class, the Court needs to separate out any differences in royalty language, but this is not so. Energen again overlooks the current class description. *All* of Energen's royalty owners under its Colorado leases are putative class members because all of these putative class members allege underpayment of royalty for fuel gas. As discussed previously, the class definition does not ride on differences in royalty provisions for post-production deductions, but on Energen's failure to pay for gas used as fuel.

Energen relies on cases which found that a certain class could not be ascertained, but these cases can be distinguished. For example, Defendant cites to *Adair v. EQT Prod. Co.*, 320 F.R.D.

---

[5] Samples of these "division orders" were not submitted to the Court as exhibits.

379, 391 (W.D. Va. 2017) for the proposition that the class could be ascertained based on only on government filings that identified the royalty owners. However, in that case one of the four proposed classes was initially defined to include both former and current gas estate owners" and so many gas estate owners were not readily identifiable. The proposed class in this case includes only present owners. Further, the court in *Adair* also found that with regard to another of the four classes, ascertainability was met when the class was narrowed to include only leases that were silent on the issue of post-production costs. The class here has been narrowed to include all leases where Energen failed to pay for has used as fuel. Energen also cites to *Abraham v. WPX Prod. Prods., LLC*, where the court found that the class was not ascertainable because plaintiffs had failed to identify which leases' gas had been or was being processed at named plants. 317 F.R.D. 169 (D.N.M. 2016). In contrast, Plaintiffs have created a chart describing the pertinent lease language in all of the leases in the purported class. *See* Doc. 235-1; *cmp. Abraham,* 317 F.R.D. at 249 (suggesting that on remand, plaintiffs could "create a chart classifying lease types" to establish predominance).

Energen contends that resolving ownership of the various leases in this case will be a "complicated and individualized process" which should foreclose class certification. Doc. 240 at 11. Energen also argues that ascertainability is rendered even more difficult because not all of names of the original lessors appear in the payment records produced in the *Thiele* lawsuit. *See* Doc. 240-3[6] *See Carol Thiele, et al. v. Energen Resources Corp*., Case No. 15-CV-01475-DME-KLM. The *Thiele* case is a related oil and gas case that was filed in Colorado and has been stayed

---

[6] The *Thiele* case is a related oil and gas case that was filed in Colorado and has been stayed pending resolution of this case. *See Carol Thiele, et al. v. Energen Resources Corp*., Case No. 15-CV-01475-DME-KLM. This Court denied Plaintiffs' request for additional discovery and ruled that the discovery provided in the *Thiele* case regarding the deduction of post-production costs could be used in this case. Thus, Energen's reliance on the discovery materials in *Thiele*

17

pending resolution of this case. Doc. 212 at 5, n.4. This Court denied Plaintiffs' request for additional discovery and ruled that the discovery provided in the Thiele case regarding the deduction of post-production costs could be used in this case. Energen's reliance on the discovery materials in *Thiele* as a reason for its inability to identify lease owners in this case is somewhat confusing, since discovery in this case was never limited to *Thiele*, and the Court's ruling simply allowed use of the materials produced in that case rather than open up discovery yet again in a case which has been in litigation since 2013. Finally, in response to Defendant's argument that the members of the proposed class are not "currently and readily ascertainable," Plaintiffs make a good point: it is hard to believe that Energen proceeded to pay royalty for over one hundred wells in the State of Colorado without knowing who it was paying as well as each owner's respective decimal interest in each well determined from their leases. Therefore, the Court rejects Defendant's argument that the members of the proposed class are not ascertainable.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiffs have met their burden for the prerequisites under Rule 23(a) for numerosity, commonality, typicality and adequacy. The Court also finds and concludes that Plaintiffs have shown that the common questions predominate over any questions affecting only individual members and that resolution of the issues in this case in a class is superior to determining liability and computing alleged damages requires an analysis of royalties paid to each owner, each month, for each well. Finally, the Court finds and concludes that the members of the proposed class are readily ascertainable.

**THEREFORE,**

**IT IS ORDERED** that Plaintiffs' Narrowed Motion for Class Certification (**Doc. 235**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE